Robert Parsons

                                                                    1

                                              Volume:  I

                                              Pages:  1-72

                                              Exhibits:  1-6

            UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF MASSACHUSETTS


Civil Action No. 03-12460-RCL

- - - - - - - - - - - - - - - - - - - x

ROBERT PARSONS,

              Plaintiff,

vs.


VERIZON BELL ATLANTIC,

              Defendant.

- - - - - - - - - - - - - - - - - - - x




            DEPOSITION OF ROBERT PARSONS

            Thursday, November 11, 2004

                  Foley Hoag

            155 Seaport Boulevard

        Boston, Massachusetts 02109

            Commencing at 9:52 a.m.

        Reporter:  Karen A. Morgan, CSR/RPR

2

1  APPEARANCES:

2

3  JAMES R. TEWHEY, ESQUIRE

4  19 North Street

5  Salem, Massachusetts 01970

6  on behalf of the Plaintiff.

7

8  FOLEY HOAG

9  By Arthur G. Telegen, Esquire

10  and Christopher J. Powell, Esquire

11  155 Seaport Boulevard

12  Boston, Massachusetts 02210

13  (617) 832-1000

14  on behalf of the Defendant.

15

16

17

18

19

20

21                                              -

22

23

24

Robert Parsons

3

1                    I N D E X

2

3   EXAMINATION OF:                              PAGE

4   ROBERT PARSONS

5   By Mr. Telegen                                 4

6

7

8

9

10                  E X H I B I T S

11  NO.                                          PAGE

12  1   Fax cover sheet dated 1/9/01 with        30

13      attached letter dated 1/8/01

14  2   Notes                                       47

15  3   Complaint                                   48

16  4   Answers to Interrogatories             48

17  5   Five-page document                          58

18  6   Return receipt with attachments        60

19

20

21-

22

23      *Original exhibits retained by Mr. Telegen

24

Robert Parsons

4

```
 1              P R O C E E D I N G S
 2              MR. TELEGEN:  The parties have agreed to
 3  hold objections and motions to strike until the time of
 4  trial and other evidentiary use of the transcript.  The
 5  witness is going to read and sign but can do so under
 6  the pains and penalties of perjury.
 7              MR. TEWHEY:  Waive notary on the signing.
 8              MR. TELEGEN:  Yes.
 9              ROBERT PARSONS, having duly affirmed that
10  his testimony would be the truth, the whole truth and
11  nothing but the truth, testified as follows in answer
12  to interrogatories by MR. TELEGEN:
13      Q.   What is your name?
14      A.   Robert W. Parsons, P-A-R-S-O-N-S.
15      Q.   Mr. Parsons, are you the plaintiff in the
16  lawsuit against I'll call it broadly Verizon?
17      A.   Yes.
18      Q.   Are you currently employed?
19      A.   No.
20      Q.   When was the last time you were gainfully
21  employed?
22      A.   When I left the company.
23      Q.   Which was when?
24      A.   September of '97.
```

Robert Parsons

5

1    Q.    Do you understand in general terms what the

2    lawsuit is about?

3    A.    Yes.

4    Q.    Can you tell me?

5    A.    I became disabled.  I was put on a disability

6    pension.  When my disability claim was completed, the

7    company took all responsibility of an on the job

8    accident.  At that time it was changed to -- a

9    disability pension was changed to a service pension.

10   Approximately a year or so after that, I was notified

11   to go in to a doctor in a rehabilitation place.  I

12   questioned that because I was on a service pension.

13   The company at that time said -- I talked to Lea

14   Davies, vice president in the personnel type deal and

15   she said they had showed me on a disability pension and

16   they were going to stop it.  I told her I believe under

17   the -- I'm looking for the word.  Under the plan that

18   they have because it was an on the job accident, I

19   should get my job back.  I wanted my job back.  She

20   told me to call the employment department.  Upon

21   calling the employment department twice with no

22   response, we wound up in the suit here.

23   Q.    Do you recall when your conversation with Lea

24   Davies was?

Robert Parsons

6

1       A.   Yes.  Approximately January 2001.

2       Q.   You asked Lea Davies for your job back?

3       A.   Yes.  I told her that's the -- as far as I

4   believe that's what the plan provided.

5       Q.   Are you sure the person you talked to was Lea

6   Davies?

7       A.   Yeah.  I talked to her twice, yes.

8       Q.   Are you sure Lea Davies is a woman?

9       A.   No.  I would assume so.  Sounded like a

10  woman.

11      Q.   Okay.  When were you first employed by --

12  Strike that.  Do you understand what corporation

13  employed you?

14      A.   I believe at the time it was NYNEX.

15      Q.   Do you know what New England Telephone is?

16      A.   Yes.

17      Q.   Do you know what the relationship between New

18  York Telephone and NYNEX was?

19           MR. TEWHEY:  Only if you know.

20      A.   No.

21      Q.   Do you know what the relationship between New

22  England Telephone and NYNEX was?

23      A.   Well, they were bought out by each other.

24      Q.   Do you know whose paychecks you received,

Robert Parsons

7

1    what the company was on the paycheck?

2        A.    You would have to be specific.  While working

3    for the phone company I received paychecks from AT&T,

4    New England Telephone, NYNEX, Bell Atlantic and some

5    benefits from Verizon and they were bought out and

6    renamed several times.

7        Q.    When were you first employed by any of NYNEX,

8    New England Telephone, Bell Atlantic, Verizon?

9        A.    In February of 1971.

10        Q.    What was your job?

11        A.    My job was an outside installer.

12        Q.    Roughly what does that job constitute?

13        A.    Climbing poles, hooking up wires to the

14    house, installing phones.

15        Q.    For how long did you have that job?

16        A.    Approximately a year and a half.

17        Q.    What was your next job?

18        A.    I worked at 210 Bent Street in the toll test

19    department.

20        Q.    What does toll test mean?

21        A.    Toll is a high priority line, data line, high

22    speed data and lottery lines.

23        Q.    How did you test them?

24        A.    With the equipment they provided for me.

Robert Parsons

8

1    Q.    Is that an indoor job at a computer?

2    A.    That's an indoor job, yes.

3    Q.    What municipality is 210 Bent Street in?

4    A.    I don't understand the question.

5    Q.    What was the location where you did --

6    A.    Cambridge.

7         MR. TEWHEY:  Make sure you let him finish

8    the question.

9    Q.    For how long were you a toll tester?

10    A.    From 1972 until I left the company.

11    Q.    Did the job change over time?

12    A.    Became more complex.

13    Q.    Is it a job you performed while seated?

14    A.    You could.  Seated, standing.

15    Q.    Well, what did you do with your hands while

16    you were doing this job?

17    A.    Operated test equipment, ran wires on a

18    frame, installed circuit boards.

19    Q.    What is a frame?

20    A.    A frame is a distribution point between

21    inside office equipment and exterior cable pairs.

22    Q.    What kinds of things did you install on the

23    frame?

24    A.    A frame is solely for wiring.

Robert Parsons

9

1      Q.    Where did you install equipment?

2      A.    In the central office.

3      Q.    In what did you install equipment?

4      A.    Into the bays provided, carrier bays,

5   equipment bays, data bays.

6      Q.    What kinds of equipment did you install in

7   the bays?

8      A.    Printed circuit boards.

9      Q.    Anything else?

10     A.    Anything that pertained to the job.

11     Q.    What was your job category?

12     A.    Toll tester technician.

13     Q.    Was that the job title throughout your last

14   25 years?

15     A.    At the very end it changed to incorporate the

16   central office technician.

17     Q.    For how long was your job title central

18   office technician?

19     A.    Perhaps a year before I left the company.  It

20   was in the process of changing.

21     Q.    Were there other people called equipment

22   installation technicians?

23     A.    Yes.

24     Q.    What did they install?

Robert Parsons

10

1      A.    They installed the bays themselves, ran

2    cable.

3      Q.    Did they install multiplexers?

4      A.    No.

5      Q.    Who installed multiplexers?

6      A.    They would install the hardware, the metal

7    bays that multiplexers went into.

8      Q.    Who would wire up the multiplexers?

9      A.    Toll test on the office side.  They would

10   wire it from there to the frame.

11     Q.    What kinds of equipment did you use to do

12   your job?

13     A.    High speed data test equipment, decibel level

14   meters, cords.

15     Q.    The equipment you described was test

16   equipment; is that correct?

17     A.    Yes.

18     Q.    Did you have tools which you installed

19   equipment with?

20     A.    We did not install equipment.  We installed

21   circuits.  -

22     Q.    What equipment -- what tools did you use to

23   install equipment?  I'm sorry.  Circuits.

24     A.    Screwdriver, pliers, cutters.

Robert Parsons

11

1      Q.   What percentage of your time was spent

2  installing circuits say the last two years of your

3  employment?

4      A.   Hardly any.  In fact, I would say none.

5      Q.   So you were basically testing equipment?

6      A.   No.  I was doing a conversion, ESS

7  conversion.

8      Q.   What is ESS conversion?

9      A.   Electronic switching system.  I would take

10  the old equipment and convert it if it was compatible

11  and have it deleted if it was not compatible.

12      Q.   How did you do that?

13      A.   You would go to each piece of equipment in

14  the office.  First of all, find out if it was

15  compatible or not and then make -- take the equipment

16  that was not compatible and have it reassigned.

17  Equipment that was compatible you would swing that into

18  the ESS machine.

19      Q.   How did you do that?  Did you have to give an

20  electronic signal?  Did you do wiring?

21      A.   The last two years basically I disconnected

22  circuits and removed all the old stuff in Malden.

23      Q.   What facility in Malden were you in?

24      A.   The phone company.  I don't know what you

Robert Parsons

12

1    mean the facility.

2        Q.    Was there a central office in Malden?

3        A.    Yes, there's a central office.

4        Q.    What is the address?

5        A.    7 Elm Street.

6        Q.    For how long were you working at 7 Elm

7    Street?

8        A.    Approximately ten years.

9        Q.    For how long of those ten years were you

10   involved in the ESS conversion?

11       A.    At Malden?

12       Q.    Yes.

13       A.    The last two, two and a half.

14       Q.    During what percentage of the day during the

15   last two or two and a half year were you involved in

16   manual labor?

17       A.    Fifty percent.

18       Q.    Does that include using screwdrivers, pliers,

19   hand tools?

20       A.    Pulling wires out of the frame.  Manually

21   pulling.

22       Q.    How did you pull wires out of the frame?

23       A.    Grasp them and you pull them.

24       Q.    With your hands?

Robert Parsons

13

1    A.    With my hands, yes.

2    Q.    How did you determine what wires to pull out?

3    A.    That was done on the conversion whether they

4    were to be converted.  They were to be disconnected and

5    LIDs, left in dead wires.

6    Q.    That is wires that were obsolete but there

7    was no business purpose for removing them; is that

8    true?

9    A.    Nobody ever removed them.  They just left

10   them there.

11   Q.    What kind of a switch was there in the Malden

12   central office?

13   A.    Before or after the conversion?

14   Q.    After the conversion.

15   A.    After the conversion number five ESS.

16   Q.    Who manufactured that?

17   A.    I have no idea.

18   Q.    What was the switch before the conversion?

19   A.    Number five crossbar.

20   Q.    If I understand what you have said, you were

21   involved in the change at the Malden CO from having an

22   electromagnetic switching process to a computerized

23   switching process?

24   A.    Electronic switching, yes.

Robert Parsons

14

1    Q.   The wires you were pulling from the frames

2  were connected to what on the other end?

3    A.   Dead pieces of equipment, disconnected

4  cables.  Part of them to the switching system that was

5  there before the number five crossbar.

6    Q.   When did you first have a physical problem

7  that interfered with your work?

8    A.   July 1997.

9    Q.   In general terms what was the problem?

10    A.   I had full body swelling edema and my hands

11  were to the point I couldn't close them.

12    Q.   Did someone eventually tell you what was

13  wrong with you?

14    A.   My hands were carpal tunnel bilateral.

15    Q.   What caused the edema?

16    A.   Pulling the wires out of the frame.

17    Q.   Is it your understanding that the problems

18  with your hands spread to your entire body?

19    A.   My understanding is my overall physical

20  condition came from pulling wires from the frame.

21    Q.   Do you know what specifically caused the

22  edema?

23    A.   Part of pulling the wires from the frame.

24    Q.   What part of your body did that affect which

Robert Parsons

15

1    caused the edema?

2            MR. TEWHEY:  If you know.

3        A.   I don't really know.  You would have to --

4    it's complicated.

5        Q.   Were you on workers comp?

6        A.   Yes.

7        Q.   From when to when?

8        A.   From 9/97 until four of '98.

9        Q.   Were you on long-term disability?

10           MR. TEWHEY:  Objection.  You can answer.

11       Q.   Do you understand that Verizon provided

12   employees with a long-term disability program?

13       A.   Yes.  I was on the long-term disability minus

14   my workman's comp.

15       Q.   From when to when?

16       A.   From nine of -- I believe nine of '97 to four

17   of '98 when I was put on a disability pension.

18       Q.   Do you recall whether it was long-term

19   disability or short-term disability you received from

20   September '97 to April '98?

21       A.   -I believe it was LTD.

22       Q.   Do you know how it came to be you got a

23   disability pension, by that I mean did you make an

24   application?

Robert Parsons

16

1        A.    Company called me and said I will -- you will

2   go on a disability pension or we will not pay you.

3        Q.    Who called you?

4        A.    I don't know.  Her name is -- my lawyer has

5   it on a piece of paper.  I don't recall.

6        Q.    Did you fill out an application of any sort?

7        A.    I filled out a retirement, full retirement

8   papers.  It was my understanding with them that at that

9   time, yes.  I filled out the papers, full retirement

10  papers, time and package papers.

11       Q.    Did you understand at that time you were

12  eligible for retirement?

13       A.    I was told at that time that this was a

14  disability pension.  If my case was solved that it was

15  an on the job accident, it would change to a service

16  pension.

17       Q.    What is your understanding as to the

18  difference between disability pension and service

19  pension?

20       A.    A disability pension is if you're unable to

21  work through a disability.  My understanding is if

22  you're hurt on the job, it is up to the phone company

23  board to allow you to retire or not depending on

24  whether they deem it is an on the job accident.

Robert Parsons

17

1    Q.   Do you understand in general terms to retire

2  with a pension you have to have had a certain number of

3  years of service and have reached a certain age or some

4  combination between those two factors?

5              MR. TEWHEY:  Objection.  You can answer.

6    A.   From what I understand, normally that is true

7  but not if you're hurt on the job.

8    Q.   From whom did you derive that understanding?

9    A.   From the package that the phone company

10  provided to me, from Grace Dobson, claims and appeals

11  assistant secretary, from the medical department.

12    Q.   Who in the medical department?

13    A.   Started off with Mrs. Backman.  I can't

14  remember her first name.  She sent me papers that so

15  stated.

16    Q.   Your understanding was that if you had a job

17  related injury, you could retire with a service pension

18  as opposed to a disability pension; is that correct?

19    A.   If the board so approved.

20    Q.   What board?

21    A.   Disability board.  -

22    Q.   You mean the phone company's disability

23  board?

24    A.   Mm-mm, yes.

Robert Parsons

18

1    Q.    Did you have an understanding as whether that

2    required a permanent disability as opposed to a

3    temporary disability?

4    A.    Yes.

5    Q.    What was your understanding?

6    A.    Excuse me?

7    Q.    What was your understanding?

8    A.    My understanding, I think I have already

9    stated it, is that if you are hurt on the job, okay,

10   and the company agrees that it was on -- you're

11   disabled on the job, they have the right to approve a

12   service pension from a disability pension as stated in

13   their booklets that they provide.

14   Q.    Mr. Parsons, my question was was it your

15   understanding the disability had to be a permanent

16   disability to be eligible for the service pension?

17   A.    At the time of review, yes.

18   Q.    Did you have an understanding as to whether

19   the disability had to be a disability from the job you

20   had been doing at the phone company or a disability

21   from all employment?

22          MR. TEWHEY:  Objection.  You can answer.

23   A.    It had to be a disability from the job you

24   were employed at at the phone company.

Robert Parsons

19

1    Q.   Generally speaking, can you describe what

2    your physical condition was at the time you left the

3    phone company, the last time you worked there?

4        A.   Poor.

5        Q.   What could or could you not do with your

6    hands?

7        A.   When I left the phone company, I had trouble

8    grasping, using my hands.  I had trigger fingers in

9    both hands.

10       Q.   When you say trigger fingers in both hands,

11   what do you mean?

12       A.   Your hand locks up like that and you can't

13   open it.

14       Q.   What is the condition of your hands today?

15       A.   My hands suffer some numbness and slight

16   weakness.  They're acceptable.  I use them every day.

17       Q.   Can you do manual labor?

18       A.   Well, you would have to describe manual

19   labor.

20       Q.   Can you do a job that required you to spend

21   50 percent of your time using hand tools?        -

22       A.   Yes.

23       Q.   For how long has your condition been such you

24   could spend 50 percent of your time using hand tools?

Robert Parsons

20

1      A.   In the last several months.

2      Q.   Starting when?

3      A.   What month is this?  November.  This year

4  they have been coming along nicely.

5      Q.   What was your condition as of January 2004?

6      A.   January 2004.  As far as what in my

7  condition?

8      Q.   Were they the same as they are now?

9      A.   No.  They weren't quite as good.

10     Q.   Could you have spent 50 percent of your time

11 doing manual labor?

12     A.   I would think so.

13     Q.   What about as of January 2003?

14     A.   Okay.  What about 2003?

15     Q.   Could you as of January 2003 spend 50 percent

16 of your time doing manual labor, that's using hand

17 tools, pulling wires?

18     A.   I don't remember.

19     Q.   Do you recall what the condition of your

20 hands was in January 2001?

21   . A.   No.

22     Q.   Did you ever tell anybody you needed an

23 accommodation to do your prior job?

24     A.   I believe I did.  Somewhere down the line as

Robert Parsons

21

1    my hands were getting better and they stopped my

2    disability pension, I believe they sent me a form and I

3    said I could return to work at that time with

4    provisions.

5        Q.    Who sent you what form?

6        A.    I don't really remember.  I'm sorry.

7        Q.    Did you understand that at some point your

8    employment by the phone company ended?

9        A.    I understood that my employment with the

10   phone company ended when I received my service

11   retirement.

12       Q.    When was that?

13       A.    That was in four of '99.

14       Q.    Did you start receiving pension payments?

15       A.    Yes, I did.

16       Q.    So you understood at that point you were a

17   retiree and not an employee; is that correct?

18       A.    I understood that I was a service pension

19   retiree.

20       Q.    Not an employee?

21       A.    Correct.

22       Q.    Am I correct that the reason why you were

23   seeking employment by the phone company after April

24   1999 is that your retirement benefits were stopped?