22

1   A.   I was seeking re-employment with the phone
2   company because they stopped my service pension telling
3   me it was a disability pension and they had the right
4   to do that and under the plan then I have the right to
5   return to work.
6   Q.   For the moment it's correct that there was a
7   causal relationship between the company's actions with
8   respect to your pension benefit and your efforts to
9   come back to work; is that correct?
10         MR. TEWHEY:   Objection.   You can answer
11   stand if understand.
12   A.   I have no idea what you're talking about.   I
13   did not understand that at all.   I'm sorry.
14   Q.   What I'm trying to get from you, Mr. Parsons,
15   is an answer to the question what caused you to seek
16   employment with the company after April of 1999.   My
17   understanding was in general terms that had the company
18   continued your benefits, putting aside how we label
19   those benefits, you would not have sought
20   re-employment.   It was the fact that they stopped the
21   benefit that caused you to seek re-employment; did you
22   agree with that general proposition?
23   A.   No.
24   Q.   So you would have sought re-employment even

23

1  if you were still getting the retirement benefit?
2      A.   When my workman's comp case was settled, I
3  called every one in the company I could think of and
4  they all told me I was on a service pension for life.
5      Q.   When was this first of all?
6      A.   When was it?  My initial calls were in four
7  of '99.
8      Q.   Who did you call?
9      A.   I called the in touch center and talked to I
10 believe it was Michelle Weatherbee.  I talked to the
11 tax department which coded the money.  A 1099 they sent
12 me as a service pension, not a disability pension.
13 There are separate boxes to check.  I called the Blue
14 Cross Blue Shield health department at the in touch
15 center.  They said you are on a service pension so I
16 did not further seek employment because I was on a
17 service pension for life.
18     Q.   A service pension would not have disqualified
19 you from working for any other company, is that
20 correct, as you understood it?
21     A.   I wouldn't know.
22     Q.   Did you seek employment with any other
23 company?
24     A.   No.

Robert Parsons

24

1  Q. Have you ever sought employment with any
2  other company than the phone company?
3  A. Yes.
4  Q. Starting when?
5  A. Starting a few months ago.
6  Q. We'll come back to that. So from the time
7  you originally got what you believed was a service
8  pension until a few months ago, you have not sought
9  employment with anybody other than the phone company;
10 is that correct?
11 A. Correct.
12 Q. You were told by Michelle Weatherbee --
13 First, what did you ask Michelle Weatherbee?
14 A. If I was -- what my status was in her
15 computer system.
16 Q. What caused you to make the phone call?
17 A. I wanted to make sure I was on a service
18 pension and not a disability pension.
19 Q. Why?
20 A. Well, initially to make sure that the company
21 changed it.
22 Q. From what?
23 A. From a disability pension that was issued to
24 me. After settling the workman's comp, the board would

Robert Parsons

25

1   make a decision and they checked to make sure it was a
2   service pension. Upon receiving letters in three of
3   2000 to go to disability exams, I immediately checked
4   with many people again in the phone company and they
5   all showed me on a service retired pension for life.
6       Q.   I'm trying to understand what caused you to
7   make the initial phone call asking whether you were on
8   a disability pension or a service pension.
9       A.   Because when the person called me and put me
10  on a disability pension, she said -- I told her I did
11  not want to go on a disability pension. She said you
12  must go or we will not pay you. I then asked her I
13  said, I have a workman's comp claim and, you know, I
14  feel it is an on the job accident and they should give
15  me a service pension. She said if and when the case is
16  settled, if it is an on the job the accident they will
17  change it to a service pension which initiated me to
18  calling to check that after the case was closed.
19      Q.   Who was the first person you were talking to?
20      A.   The first phone call I made? I made a call
21  to the in touch center, okay, which handles your
22  benefits, your pension, everything, and I talked to
23  people in the pension department, the Blue Cross Blue
24  Shield department, the dental department. I called the

26

1   president's secretary Lee -- Mr. Seidenberg and she
2   checked her computer and they all showed I was on a
3   service pension retired for life.
4        Q.   You said you talked to Mr. Seidenberg?
5        A.   No.  I talked to his secretary.
6        Q.   Who was Seidenberg?
7        A.   President of the phone company.
8        Q.   When was that?
9        A.   That was back in four of '99.  Four of '99
10  when my workman's comp was settled by that point.  I
11  rechecked with people when I was sent letters to go for
12  a disability exam and they also said that I was on a
13  service pension retired for life.
14       Q.   That included Mr. Seidenberg's secretary?
15       A.   Yes, sir.
16       Q.   She told you you were -- do you remember what
17  her name was?
18       A.   No, I don't.  I forget that name.  I have
19  several other names but I can not recall them right
20  now.
21       Q.   Your interrogatory answers list the name Ira
22  Seidenberg.
23       A.   Yes, Seidenberg, Steidenberg.  I'm sorry if
24  I'm not pronouncing it correctly.

1    Q.   And when did you communicate with
2  Mr. Seidenberg or his secretary from 1997 to the
3  present?
4    A.   I contacted her in March of 2000, okay,
5  Mr. Seidenberg's secretary and also Mr. Finger's
6  secretary.  He was the president of personnel.
7    Q.   Are you sure that was in March of 2000?
8    A.   I believe so.
9    Q.   Ezra Finger?
10   A.   Ezra Finger, yes.
11   Q.   March of 2000 what conversation did you have
12 with Mr. Finger?
13   A.   I talked to his secretary, told her that I
14 was under the understanding I was on a service pension
15 and they had sent me some forms to be evaluated for a
16 disability pension.  She said, oh, no.  You're on a
17 service pension for life.  No one can take that away
18 from you.
19   Q.   Is this all in one phone call or did the
20 person call you back?
21   A.   This was one phone call.
22   Q.   How did Mr. Finger's secretary -- did she
23 know you personally?
24   A.   I told her my first name.

1   Q.   No but how did she find all this information
2   out?
3   A.   She looked in the computer or she made a
4   phone call while I was on hold. I don't really
5   remember.
6   Q.   So in March of 2000 Mr. Ezra Finger's --
7   A.   Secretary.
8   Q.   Mr. Finger has what position?
9   A.   I believe he's president of the personnel or
10  vice president of personnel. I believe he is the
11  president. He may be the vice president.
12  Q.   Where was he located?
13  A.   Somewhere in New York. White Plains I
14  believe. I may be wrong.
15  Q.   Did you make any notes of this conversation?
16  A.   Did I make any notes?
17  Q.   Yes.
18  A.   Mentally.
19  Q.   Do you know if Ezra Finger is in any related
20  to Ezra Singer?
21  A.   I'm not that close to him.
22  Q.   If I suggested to you that Ezra Singer was
23  the executive vice president for human resources for
24  Verizon Corporation, is it possible that you

29

1  misremember Ezra Finger and the person's name is really
2  Ezra Singer?
3      A.   No.
4      Q.   You're absolutely certain it is Ezra Finger?
5      A.   No. Now that I think of it, you know, it has
6  been seven years this thing has been dragging on;
7  however, I'm pretty sure it was Mr. Finger stuck in my
8  mind.
9      Q.   If I suggested to you that Bell Atlantic and
10 GTE merged in June of 2000 and until then Mr. Singer
11 was located in Dallas and employed by GTE, would that
12 be consistent with your memory?
13         MR. TEWHEY:  Objection.  You may answer.
14     A.   No.
15     Q.   You're pretty sure it is Mr. Finger and
16 you're pretty sure it was March of 2000?
17     A.   I'm pretty sure it was Mr. Finger.  I derived
18 his name from the phone book.
19     Q.   How did you derive his name from the phone
20 book?
21     A.   I called information and asked for the
22 president of personnel.
23     Q.   And someone answered saying Mr. Finger's
24 office?

1   A.   Yeah. I believe so.
2   Q.   Did you have any conversation with
3   Mr. Finger's secretary after March of 2000?
4   A.   I don't believe so.
5   Q.   How about Lea Davies? When did you speak to
6   Lea Davies?
7   A.   I spoke to Lea Davies -- give me a second. I
8   believe in 2000 or January 2001. I spoke to her twice.
9   Q.   And where was Ms. Davies located?
10  A.   I don't know.
11  Q.   What was her phone number.
12  A.   She doesn't have one according to the phone
13  company.
14  Q.   How did you speak to her?
15  A.   I got her fax number at which they had
16  listed.
17  Q.   What was her fax number?
18  A.   I have it written down somewhere but I can't
19  recall it.
20          (Exhibit No. 1 marked.
21           for identification.)
22  Q.   Can you identify Exhibit 1?
23          (Witness perused document.)
24  A.   Mm-mm.

Robert Parsons

31

| | | |
|---|---|---|
| 1 | Q. | What is Exhibit 1? What is it? |
| 2 | A. | What is this letter. |
| 3 | Q. | There are two pages to Exhibit 1. The first page is a fax cover sheet? |
| 5 | A. | Fax cover sheet, right. |
| 6 | Q. | It is from you to Lea Davies; is that correct? |
| 8 | A. | Lea Davies fax machine, right. |
| 9 | Q. | Where did you get that number? |
| 10 | A. | From information. |
| 11 | Q. | 411? |
| 12 | A. | I believe she referred me to an operator in the phone company that handles the phone company numbers. |
| 15 | Q. | Your memory is that there was a fax number listed for Ms. Davies but not a telephone number? |
| 17 | A. | That's correct. |
| 18 | Q. | Do you know where 973 is? |
| 19 | A. | 973. |
| 20 | Q. | Area code? |
| 21 | A. | No, I don't. |
| 22 | Q. | This says ten pages. As produced to us, it had only the fax cover sheet and the letter which is dated January 8, 2001. Do you know what was part of |

32

1  the original?  Do you know what was part of the
2  original document?
3      A.  I believe this is all the -- the original
4  contact letter is one page.
5      Q.  Do you know why it says ten pages on the
6  cover sheet?
7      A.  No.
8      Q.  Who is Lynna Thompson whose name is on the
9  cover sheet?  Is that your note?
10     A.  That was a note that I had called the tax
11 department to ask them the 1099 that they filled out
12 for the federal government what sort of pension she
13 showed me on and she said you are on a service pension.
14 I said, how do you know that, Miss Thompson.  She said,
15 it says that right here in the computer and I also
16 verified with her that the 1099 was coded as a service
17 pension, not disability pension.
18     Q.  Michelle Weatherbee is the person you
19 mentioned?
20     A.  I called Micelle Weatherbee in the pension.
21 She is a pension specialist as noted here on the page
22 and she said that I am on a service pension and no one
23 should be able to take that away from me.
24     Q.  Okay.

Robert Parsons

33

1  A. You should receive it for life.
2  Q. Did Ms. Davies call you in response to the
3  fax?
4  A. Yes, she did.
5  Q. And what did you say and what did she say
6  during the course of your conversation?
7  A. In the course of the -- she called me twice.
8  We talked -- the first conversation?
9  Q. Yes.
10 A. The first conversation I informed her that I
11 had been receiving the disability pension and should
12 have been changed to a service pension and they had
13 called me to go to a disability evaluation and at that
14 point they had stopped it I believe in 11 of 2000, and
15 I told her that I should be receiving a service pension
16 and she said she would look into it and get back to me.
17 Q. And how soon after January 9, 2001 was that
18 first conversation?
19 A. I believe it was the next day or the day
20 after.
21 Q. Did she call you back again?
22 A. She called me back I believe within a day or
23 two.
24 Q. What was the second conversation?

1    A.   The second conversation was she said she --
2  she said that I was on a disability pension and I said,
3  well, everybody shows me on a service pension.  She
4  said, I can only go by what they tell me which was a
5  disability pension she said.  So I said, well, under
6  the plan being hurt on the job, no longer being
7  disabled, I would like to go back to work.  I want my
8  job back, and she said, well, you would have to call
9  the employment department.  So I said to her, I don't
10 mind doing that but why can't I report back to work
11 Monday as I think the plan states I should get my job
12 back.  She said, well, you just can't walk back to
13 work.  You have to call the employment department.  I
14 said, thank you.  I will.
15   Q.   Did she say why you can't just report back to
16 work?
17   A.   No.  Well, she said I had to go through the
18 employment department.
19   Q.   Because you were no longer an employee?
20   A.   She didn't say that.  She said I had to go
21 through the employment department.
22   Q.   Did you have any conversations with Ms.
23 Davies after that second phone call subsequent to
24 January 9, 2001?

Robert Parsons

35

1      A.   No.

2      Q.   So all your conversations with Ms. Davies
3  were in January 2001; is that correct?

4      A.   I believe so.

5      Q.   Probably finished by January 15th at the
6  latest?

7           MR. TEWHEY:  Objection.  If you know.

8      Q.   Is that correct?

9           MR. TEWHEY:  You can answer.

10     A.   Probably, yeah.

11     Q.   Your conversation with Mr. Finger's secretary
12 occurred before or after your conversation with Ms.
13 Davies?

14     A.   I believe that it occurred before that.

15     Q.   You said March of 2000.

16     A.   No.  You would be looking at -- no.  That
17 conversation took place in December of 2000
18 approximately.

19     Q.   But you said March 2000.

20     A.   I called him several times if that's what
21 you're talking about.

22     Q.   When was the first time you called him?

23     A.   First time I called him was in March 2000.

24     Q.   Do you have any notes of your conversation

Robert Parsons

36

1  with Ms. Davies?
2      A.    Yes.  My lawyer has them.  My personal notes
3  you mean?
4      Q.    Notes that you have taken of your
5  conversation with Ms. Davies.
6      A.    Yes.
7      Q.    You provided those to your lawyer?
8      A.    Yes.
9            MR. TEWHEY:  I'll double check.
10           MR. TELEGEN:  Let's go off the record.
11              (Discussion off the record.)
12              (A break was taken.)
13           MR. TELEGEN:  During our recess, I think I
14  understand the following, that Mr. Parsons has not
15  produced any notes of the sort he described in his most
16  recent answer to counsel and that Mr. Parsons will I
17  guess go back and see if he can find anymore notes at
18  his home; is that correct?
19           MR. TEWHEY:  Yes.
20           MR. TELEGEN:  We are all in agreement.
21           MR. TEWHEY:  Yes.
22      Q.    Let me ask you again, Mr. Parsons.  Do you
23  have a specific recollection of taking notes of your
24  conversation with Ms. Davies?

JONES REPORTING COMPANY
617-451-8900

1  A.  Yes.

2  Q.  You don't have a recollection of throwing
3  them away?

4  A.  No. I read them last night. I know I had
5  them.

6  MR. TEWHEY: Let me ask a question. Did
7  you bring them with you?

8  A.  I brought the chopped down version in my car.

9  MR. TEWHEY: Do you want a take a break for
10  a second and we'll take a look at them?

11  MR. TELEGEN: I guess so. I think that
12  Mr. Parsons has now told us in his car is his
13  briefcase. In his briefcase there is some form of
14  notes that may be relevant whether they are exactly the
15  same notes he took of his conversation with Ms. Davies
16  or otherwise. I think everybody is in agreement we
17  should get into Mr. Parsons' briefcase to see what it
18  holds. Obviously you review them first. I'm not going
19  to go through his briefcase.

20  MR. TEWHEY: You're right.

21  MR. TELEGEN: Why don't we recess until
22  11:30.

23  (A break was taken.)

24  MR. TEWHEY: Mr. Parsons and I have gone

38

1  out and reviewed what he had in his briefcase in his
2  vehicle. What he has in his vehicle are a set of notes
3  that he produced for me some time ago. It's a
4  chronology of what happened to him while at the company
5  and while retired. Mr. Parsons has informed me that he
6  produced that chronology from a set of notes that he
7  had made over a period of time. We have I think agreed
8  that the notes that he produced for me are part of work
9  product and not discoverable; however, the notes that
10 he used to create that chronology are discoverable and
11 if he has them, we'll produce them.
12         MR. TELEGEN: I guess I have a couple of
13 questions about those notes because they are not --
14 certainly in the form they were produced they are
15 privileged. I don't have a right to them. I am a
16 little concerned about their use after they were
17 produced to you because he retained a set. One concern
18 I have is if Mr. Parsons reviewed those notes in
19 anticipation of the deposition and they refreshed his
20 memory or may even constitute his memory, they probably
21 are produceable. If you want to talk about that with
22 him before I ask him a question. You understand my
23 concern.
24         MR. TEWHEY: I understand your concern.

39

MR. TELEGEN: It is not as though they are in his hands. If they're being used to form the basis of his testimony, they raise a different set of questions.

MR. TEWHEY: Then I don't think I have to have a conversation with him. I think I understand how he used them. We discussed that. What I would say then, and I don't have a problem in the form that they're in now, if you after questioning decide you think they are discoverable, I'm not going to get into a dog fight about that because I think it is fairly benign. I will say the one thing I did do is I removed the top two sheets from the notes before coming back in here and what those constitute are my own notes which were a series of questions for him at the time that he produced those notes to me and those I don't think are discoverable.

MR. TELEGEN: Let me find out what he looked at before we start worrying about it.

MR. TEWHEY: Okay.

MR. TELEGEN: Were it not for the fact he looked at them for preparation for his testimony, we would not be having this discussion. Your questions to him are privileged and the responses to those questions

1  are privileged.  I want to get some sense as to what
2  use he has made of them.
3      Q.  Mr. Parsons, at some point in time you gave
4  your counsel some notes?
5      A.  Correct.
6      Q.  What caused you to give him notes?
7      A.  He asked me to list them in order of the
8  events that happened.
9      Q.  You prepared a chronology for him.
10     A.  Yes.
11     Q.  He gave you some questions that were designed
12 to elicit that chronology?
13         MR. TEWHEY:  No.  Let me be clear.  What I
14 did was after I got the chronology, I had a set of
15 questions for him.
16         MR. TELEGEN:  Okay.  Fair enough.
17     Q.  Mr. Parsons, when did you prepare that
18 chronology?
19     A.  I believe it was the second or third meeting
20 that I had with my attorney.
21     Q.  When was that?
22     A.  Which would be late 2001, early 2002.
23     Q.  The first legal proceeding relating to the
24 current claims that you brought before the Mass.

1  Commission Against Discrimination; is that correct?
2      A.   Yes.
3      Q.   Did you file those yourself or did your
4  current counsel file those or did somebody else file
5  them?
6      A.   I believe I tried to file them myself and at
7  a later point my attorney filed something also.
8      Q.   I believe I have seen a document with the
9  name Elizabeth Rodgers.
10     A.   Elizabeth Rodgers was my original attorney
11 who referred me to Jim.
12     Q.   Jim being Mr. Tewhey?
13     A.   Mr. Tewhey, Attorney Tewhey.
14     Q.   Do you recall when you contacted Miss
15 Rodgers?
16     A.   2001.  February, March maybe.  I don't really
17 have a specific date.  Roughly that.
18     Q.   You wrote a variety of letters to people
19 about your pension?
20     A.   Yes.
21     Q.   Did any lawyer assist you with those letters?
22     A.   No.
23     Q.   At some point in time you learned that you
24 were not to receive a service pension according to