Robert Parsons

42

1 whoever was deciding such things; is that correct?
2     A.    Yes.
3     Q.    Do you recall whether you contacted Miss
4 Rodgers before or after you received that decision?
5     A.    I believe that was after.
6     Q.    Which was after you contacted Miss Rodgers?
7     A.    I contacted Miss Rodgers after they had
8 canceled my pension.
9     Q.    How soon after?
10    A.    It would be three to four months maybe.
11    Q.    Then did Miss Rodgers immediately refer you
12 to Mr. Tewhey or was there some expanse of time between
13 the two?
14    A.    It was maybe a month or so in-between.
15    Q.    Is it your belief you talked to Mr. Tewhey in
16 2001 for the first time?
17    A.    Yes. I believe I talked to him for the first
18 time around July 2001.
19    Q.    In relationship to that first meeting do you
20 recall when you made the chronology that you have and
21 you made for Mr. Tewhey?
22    A.    At a meeting sometime between July and the
23 end of 2001 I believe.
24    Q.    Okay. Have you shown it to anybody other

Robert Parsons

43

1  than Mr. Tewhey since the time you made it?
2      A.   My wife may have looked at it. Other than
3  that.
4      Q.   Anybody other than your wife?
5      A.   Not that I recall, no.
6      Q.   Did you show it to the Mass. Commission
7  Against Discrimination?
8      A.   No, I did not.
9      Q.   You kept a copy for yourself; is that
10 correct?
11     A.   Yes.
12     Q.   And what use have you made of the document
13 since you gave it to Mr. Tewhey, if any?
14     A.   None.
15     Q.   I think you said before we broke that you
16 reviewed it prior to today's meeting.
17     A.   Yes.
18     Q.   When did you review it?
19     A.   I went over my notes last night to get the
20 dates and whatnot. People's names correct in my head.
21           MR. TELEGEN:  I think, Mr. Tewhey, that's
22 enough to make it discoverable. Under the
23 circumstances, I'm not sure we can readily separate out
24 Mr. Parsons' current memory from what he learned from

1  the notes and they are his own notes, his reflection of
2  the facts so I take it from what you said they don't
3  really give legal advice or provide legal advice.
4  They're a rendition of facts used to refresh his memory
5  today. I think they are produceable for that reason
6  but I won't ask for them right now.
7      Q.   When you originally sat down to make the
8  document you reviewed last night, what did you do use
9  besides your memory to make those, make that outline?
10     A.   The original notes.
11     Q.   What original notes did you have?
12     A.   I have a briefcase full of original notes at
13 home.
14     Q.   Have you produced that briefcase full of
15 original notes to Mr. Tewhey?
16     A.   No.
17     Q.   Okay.
18          MR. TELEGEN:  Let's go off the record
19 again.
20          (Discussion off the record.)
21          MR. TELEGEN:  I think there's no
22 disagreement, I'm not assigning fault at this point,
23 that Mr. Tewhey should have seen the briefcase full of
24 notes to make a judgment about what should have been

45

1  produced pursuant to a document request that is now
2  some significant number of months outstanding. It is
3  the case discovery closes on Monday.
4          MR. TEWHEY: Tuesday I believe. Monday,
5  Tuesday.
6          MR. TELEGEN: For present purposes the
7  difference is academic.
8          MR. TEWHEY: Yes.
9          MR. TELEGEN: I'm going to walk down to my
10 office and get my calendar.
11         (Brief recess.)
12         MR. TELEGEN: We are going to spend a
13 little more time today. Then we will suspend and come
14 back. I want to try -- I don't want to waste
15 everybody's time by going over the same ground twice.
16    Q.   Mr. Parsons, let me ask you. You said it is
17 all in a briefcase. Describe the briefcase.
18    A.   It is brown standard briefcase.
19    Q.   When was the last time you looked inside the
20 briefcase?
21    A.   I had opened it to look at my notes last
22 night.
23    Q.   Do you think the prior notes are still in
24 there? Could you tell that from your --

Robert Parsons

46

1    A.    I don't know.
2          MR. TELEGEN:  I would like to see the notes
3    in the original form if I could.  Whatever is
4    produceable in its original form.  I can make copies.
5    I'll let you take back the originals but under the
6    circumstances, I think I would like to see the
7    originals, how they appear.
8          MR. TEWHEY:  Why don't we do this then?  I
9    am actually scheduled to be out of town tomorrow on a
10   personal matter.  I will push that off.  I'll meet with
11   Mr. Parsons at nine o'clock, eight o'clock or nine
12   o'clock tomorrow morning, review what he has in that
13   file.  I will make copies.  I will bring the originals
14   down here before.  I'll change my flight and move it
15   back in the day.  Before I take off, I'll drop the
16   originals off here for you.
17         MR. TELEGEN:  Okay.  That's fine.  Under
18   all the circumstances, do you have with you a copy of
19   what Mr. Parsons produced to you, the chronology?
20         MR. TEWHEY:  The chronology, yes, I do.
21         MR. TELEGEN:  Could I see that now?
22         MR. TEWHEY:  Yes.
23         MR. TELEGEN:  Is this the original of the
24   chronology?

47

1    MR. TEWHEY: That is the original of the
2 chronology, yes. There is a typed version that my --
3 well, not my current secretary by my former secretary
4 produced which is simply a typed version of that.
5    MR. TELEGEN: Let's go off the record.
6    (Discussion off the record.)
7    MR. TELEGEN: Can you mark this?
8    (Exhibit No. 2 marked
9    for identification.)
10   Q.   Am I correct, Mr. Parsons, what has been
11 marked as Exhibit 2 are the notes that we have been
12 referring to during this recent discussion?
13   A.   In part, yeah.
14   Q.   When you say in part, what part aren't they?
15   A.   Well, part to my mental memory.
16   Q.   When you say your mental memory, I'm not sure
17 I follow.
18   A.   In these notes it just says for instance
19 first entry Beverly emergency room. If you asked me
20 what happened there in detail, I would provide the
21 detail from memory.
22   Q.   Okay. But these are the notes that you said
23 you prepared for Mr. Tewhey; is that correct?
24   A.   Yes.

Robert Parsons

48

1    Q.   Are those all the notes you prepared for
2  Mr. Tewhey and reviewed prior to the deposition today?
3    A.   Yes.
4    Q.   Did you review anything else in preparation
5  for the deposition today?
6    A.   No.
7           (Witness conferred with counsel.)
8    A.   Yes. I forgot about that. We actually went
9  over the interrogatories and the complaint questions,
10 complaint and jury claim.
11          (Exhibit No. 3 marked
12           for identification.)
13   Q.   Could you identify Exhibit 3?
14   A.   Yes.
15   Q.   Is that the complaint you reviewed in
16 preparation for today's deposition?
17   A.   Yes.
18          (Exhibit No. 4 marked
19           for identification.)
20   Q.   Could you identify Exhibit 4?
21          (Witness perused document.)
22   A.   Yes.
23   Q.   Are those the interrogatory answer responses
24 that you reviewed in anticipation for today's

1    deposition?
2        A.    Yes.
3        Q.    When you reviewed exhibits three and four,
4    did you observe anything that was inaccurate?
5        A.    In interrogatory number three and four?
6        Q.    Exhibits 3 and 4, that is the complaint that
7    is filed on your behalf in this case and the
8    interrogatory answers.  Is there anything that you saw
9    that was inaccurate?  This is the complaint, sir.
10   That's Exhibit 3 and these are interrogatory answers.
11   This is Exhibit 4.
12       A.    Which one are you talking about?
13       Q.    Both.  Either one.  Do you see anything that
14   seems to you to be inaccurate?
15       A.    No.
16       Q.    Thank you.  You realize on Exhibit 4 you
17   signed the answers under oath; correct?  On the last
18   page of Exhibit 4 you will see it says signed under the
19   pains and penalties of perjury.  I take it that's your
20   signature; is that correct?
21       A.    That is my signature.
22       Q.    Are the answers that are in Exhibit 4 still
23   accurate to the best of your memory?
24       A.    Yes.

50

1    Q.    I'm really asking you, Mr. Parsons, when you
2    reviewed these things did you look at it and said, boy,
3    that doesn't sound right to me.  I don't know how that
4    happened or something like that?
5    A.    After further review with my lawyer, there
6    were a few corrections in Exhibit 3.  The facts,
7    instead of October 10, 1949, I was born October 5,
8    1949.  Of course my age has changed since the
9    complaint, and number nine, it was actually in March of
10   1999 that I was informed my retirement was under
11   review, not November 17, 2000.
12   Q.    Anything else?
13   A.    I believe everything else is correct.
14   Q.    Paragraph 14 of the complaint refers to a
15   doctor letter which states you could return to work
16   with minor accommodations.  Do you see that?
17   A.    Yes, I do.
18   Q.    What letter is that that is being referred to
19   there?
20   A.    I have no idea.  I have never been shown the
21   letter.
22   Q.    This says you provided Verizon with such a
23   letter.  Do you know what letter the complaint refers
24   to?

51

1   A.   I'm sorry. I was provided with a letter
2   which Richard Schwartz provided to me from the doctor.
3   Q.   Let's start with who is Richard Schwartz?
4   A.   Richard Schwartz was my attorney for the
5   workman's compensation case.
6   Q.   And first all, when did he provide you with
7   such a letter?
8   A.   In July of 2001 at a meeting with Myles
9   Calvery at his office in Salem, Massachusetts.
10  Q.   Do you know how to spell Calvery?
11  A.   C-A-L-V-E-R-Y.
12  Q.   Who is he?
13  A.   He's the president of Local 2222 IBEW Boston
14  which represents the phone company.
15  Q.   And where did Mr. Schwartz get this note
16  from, letter from?
17  A.   He asked me for a request from the doctor.
18  Q.   My question was bad. Let me do it again.
19  Mr. Schwartz asked what doctor for a note?
20  A.   I believe his name was Bruce Leslie, a doctor
21  I went to see in Newton.
22  Q.   Did you have in your possession any letter or
23  note from Dr. Leslie?
24  A.   As provided from the phone company. I asked

52

1  the doctor for a copy of the exam which he never sent
2  me. That's why Mr. Schwartz asked for a copy and
3  provided by Verizon.
4      Q.  The allegation in Paragraph 14 of the
5  complaint that has been marked as Exhibit 3 says that
6  Parsons, you, provided Verizon with a doctor's letter
7  which stated that he could return to work with minor
8  accommodations. I infer from that that you gave
9  somebody a letter; is that correct? Is that your
10 understanding?
11     A.  It could very well be. I'm a little confused
12 because my doctor appointments number over 200 that I
13 went to with this case.
14     Q.  We'll go back to Dr. Leslie. Who is Dr.
15 Leslie?
16     A.  Dr. Leslie was the doctor that the phone
17 company sent me to for a disability evaluation. I was
18 notified in March of 2000 of the appointment. I
19 attended it in June of 2000 due to his rescheduling.
20     Q.  You saw Dr. Leslie at Newton Wellesley
21 Hospital?
22     A.  I believe so.
23     Q.  Did he give you a letter or a note?
24     A.  He gave me nothing.

Robert Parsons

53

1   Q. Did Mr. Schwartz give you a letter or a note?
2   A. He gave me a note which was an explanation
3   from the company which I believe had Dr. Leslie's
4   opinion in it.
5   Q. Can you describe that document to me?
6   A. The document stated that after review, my
7   disability appointment with Dr. Leslie and also my
8   examination from a rehab appointment that they made
9   that I was able to perform some work. That's what it
10  stated.
11  Q. It said you had some work capacity?
12  A. That's what I believe it said, yes.
13  Q. Did it say you could return to work with
14  minor accommodations?
15  A. I don't remember.
16       MR. TEWHEY: The examination took place on
17  Thursday, April 6th of 2000.
18  A. I believe you're looking at the -- I went to
19  two different appointments. I know one was postponed
20  until June.
21       MR. TELEGEN: If it would be possible,
22  Mr. Tewhey, before the deposition resumes to provide me
23  with a copy that that allegation relates to.
24       MR. TEWHEY: Yes.

54

1	MR. TELEGEN:  Because it doesn't look like
2  Mr. Parsons can give us specific information about any
3  such letter being provided to Verizon.
4	Q.   Had you finished identifying where you
5  thought there were mistakes in the complaint?
6	A.   I believe so.
7	Q.   Exhibit 2 is slightly smaller than eight and
8  a half by 11 three-hole paper held together by one gold
9  sort of butterfly clip; is that right?
10	A.   I would say so.  Button clip.
11	Q.   And it is mostly written in one hand but
12  there are a few places where there is sort of additions
13  made between dates; is that correct?
14	A.   Yes.  I think in addition all at once.  As I
15  wrote it, something didn't fit in the chronology so I
16  inserted it.
17	Q.   Did you write Exhibit 2 all at one sitting?
18	A.   I believe I did.
19	Q.   You have testified about a conversation or
20  conversations, two actually with Ms. Davies.  I think
21  you said after your second conversation with Ms. Davies
22  you didn't speak to her again; is that correct?
23	A.   That's correct.
24	Q.   You mentioned a few conversations with

                                                               55

1  Mr. Finger?
2      A.   Secretary.  His secretary.
3      Q.   His secretary.  I'm sorry, and that they
4  started in March of 2000 and extended for some number
5  of months after that; is that correct?
6      A.   I believe in March of 2000 and then in
7  December early January.  December 2000 to January 2001.
8      Q.   And you mentioned something to
9  Mr. Seidenberg's secretary?
10     A.   That's correct.
11     Q.   That was when?
12     A.   I'm not sure if I spoke to her once or twice
13 but I'm sure I spoke to her sometime in the December of
14 2000, January of 2001.
15     Q.   The conversations with Mr. Finger's secretary
16 and Mr. Seidenberg's secretary both related to what
17 kind of a pension you were getting; is that correct?
18     A.   Yes.
19     Q.   But your memory is the second time you talked
20 to Ms. Davies the conversation turned to your being
21 employed by Verizon and in particular she referred you
22 to the employment office?
23     A.   Correct.
24     Q.   What did you do next about becoming

56

1  re-employed by Verizon?
2      A.   I obtained a number for the employment
3  department.  I called the employment department,
4  listened to the recording which you could not talk to
5  any person.  The recording told me to submit a resume
6  and I should send it to the former employee department
7  and I could also e-mail them.
8      Q.   So the recording at the employment department
9  was it specific to employees who had been terminated
10 because of a disability?
11     A.   It was a recording that told you where to
12 send your resume for employment.  If you were a new
13 candidate or a candidate that was formerly employed.
14     Q.   So it was a recording and it gave you two
15 choices, new candidate versus former candidate?
16     A.   Former employee.
17     Q.   Former employee.  Did it distinguish between
18 former employees who had like quit versus former
19 employees who were in your circumstances?
20     A.   No.  It said former employees if I remember.
21     Q.   Do you recall what number you called to get
22 this recording?
23     A.   I called the -- I believe it was an 800
24 number provided to me by information.

57

1  Q. Did information say for Verizon, New England
2  or NYNEX, for entire Verizon nationwide? Was there any
3  indication what 800 number you were talking to?
4  A. I was talking to the Verizon employment
5  department. At that time Verizon encompassed greater
6  New England to my recall.
7  Q. What did you do next?
8  A. I e-mailed my resume to Verizon at the web
9  site they provided. I also I mailed them a copy with a
10  return receipt and that was February of 2001. I also
11  when through this whole -- I also reiterated this
12  process in June of 2001.
13  Q. Was that in exactly the same fashion?
14  A. Yes.
15  Q. So you e-mailed your resume to --
16  A. I -- yes.
17  Q. When you e-mailed your resume, how did you do
18  that?
19  A. I e-mailed it to the e-mail site that they
20  gave me and I think it was something New England jobs,
21  Verizon jobs, former employee department at Verizon or
22  whatever the recording told me to do.
23  Q. How did you go about e-mailing? Did you just
24  take your resume and --

Robert Parsons

58

1   A.    Yes, I sent it to --

2   Q.    How did you send it by e-mail?

3   A.    Through a computer. My home computer.

4   Q.    So was it like you scanned it in?

5   A.    No. I didn't scan it in. I sent it through
6   the e-mail.

7            (Exhibit No. 5 marked
8             for identification.)

9   Q.    Mr. Parsons, I'm going to show you four
10  pieces of paper that have been stapled together and
11  marked as Exhibit 5. They have been produced related
12  amongst themselves but we want to make sure you agree
13  with that.

14           (Witness perused documents.)

15  Q.    The first two pages appear to be a postal
16  receipt. It is ultimately signed by someone named
17  Michael Bethea, B-E-T-H-E-A, on February 4, 2001. He
18  seems to be at an address in some Falls, New Jersey.
19  I'm not sure I can read it beyond that. Did you send a
20  resume to New Jersey?

21  A.    I don't remember sending a resume to New
22  Jersey. It seems to me that there should be another
23  return receipt in there that shows I sent this to the
24  employment department.

59

1    Q.   Would I be correct the receipt signed by
2  Michael Bethea in fact relates to the document you
3  filed relating to your pension?
4    A.   I believe it related to an appeal of the
5  company's decision.
6    Q.   To the best of your recollection the resume
7  that is part of Exhibit 5 was not what you sent to
8  Mr. Bethea or he signed for; is that correct?
9    A.   I believe that there is a mix-up with the
10 papers.
11   Q.   So it is correct you don't have any reason to
12 believe Mr. Bethea got the resume; is that correct?
13   A.   I don't know.  He may have.
14   Q.   Did you send it to him?
15   A.   I sent them a statement saying I wanted my
16 job back.  I should be re-employed.  I don't know if I
17 sent him a resume.  He was the person who signed for
18 it.
19   Q.   You sent someone in New Jersey --
20   A.   Yes.
21   Q.   You sent someone a letter saying you wanted
22 your job back?
23   A.   Yes, I did.
24   Q.   When was that?

60

1    A.  That was in December of 2000 or January 2001.
2  Approximate time in that time frame.
3    Q.  That wasn't the thing that was covered by the
4  receipt to Mr. Bethea; is that correct?
5    A.  Mm-mm.  Because I sent that -- that letter I
6  sent to claims and appeal.
7    Q.  Which letter, sir?
8    A.  The letter stating I wanted my job back and
9  that I disagreed with their decision per the contract.
10   Q.  Do you know who that letter was addressed to?
11   A.  Can I look at my note?
12   Q.  Sure.  You're looking at Exhibit 2; is that
13 correct?
14   A.  Look at Exhibit 2.
15           (Witness perused document.)
16   A.  I can't recall her name.  It was the lady who
17 handled my case in claims and appeal.  She was
18 assistant secretary was her title.
19   Q.  Okay.
20   A.  Grace Dobson.
21           (Exhibit No. 6 marked
22           for identification.)
23   Q.  Can you identify the papers that are put
24 together as Exhibit 6?

Robert Parsons

61

1        (Witness perused documents.)
2    A.   Yes. This is the resume I sent to the
3 recruiting department.
4    Q.   The receipt is dated June 2001. Do you see
5 that?
6    A.   That's correct.
7    Q.   Is that when you sent this to the recruiting
8 department?
9    A.   That was actually the second copy I sent to
10 them. I had sent one to them in February also.
11   Q.   Do you have the receipt from that one?
12   A.   I don't believe I do have the receipt from
13 that one.
14   Q.   Do you know what address you sent it to?
15   A.   Exactly the same address.
16   Q.   Room 866?
17   A.   Yes.
18   Q.   Former employee department?
19   A.   Correct.
20   Q.   And do you know where you got the room 866
21 address?
22   A.   From the recording.
23   Q.   Did you send anything other than the resume
24 in the package?