Robert Parsons

62

1    A.    I e-mailed them both times.
2    Q.    But I mean the package you mailed, was it
3  just the resume?
4    A.    Correct.
5    Q.    Now, when you say you e-mailed the resume,
6  did you e-mail exactly the two pages that are attached
7  to Exhibit 6?
8    A.    I believe I sent these two pages, right.
9    Q.    You sent those two pages through the e-mail
10  in exactly the form they're in as Exhibit 6; is that
11  correct?
12    A.    I would say that's correct.
13    Q.    There was no form to fill out or anything
14  like that?
15    A.    There was simply a recording. There was no
16  one to talk to.
17    Q.    There was no form to fill out on the internet
18  or anything. You just e-mailed them the resume?
19    A.    I e-mail them, yes, these two pieces of
20  paper.
21    Q.    Again, no cover letter or any other document
22  with the two pages of the resume; is that correct?
23    A.    No. I believe this is exactly what they
24  asked for in the recording.

63

1    Q.   Is there anything to indicate you had been
2  taken off a disability pension in the documents you
3  sent to them?
4    A.   Yes.
5    Q.   What is that?
6    A.   On the bottom of the page it says disability
7  pension August 1998 to present.
8    Q.   I see. Did it indicate you were no longer on
9  a disability pension?
10    A.   To the present meaning that's clarifying my
11  work category. Applying for a job.
12    Q.   Did anybody from the former employee
13  department contact you?
14    A.   No.
15    Q.   Did you call them?
16    A.   Yes. I got a recording.
17    Q.   Did you make any other effort to contact the
18  returning employee department? I'm sorry. The former
19  employee department?
20    A.   After twice I sent the resume in, it stated
21  on the recording that in so many words that no human
22  would answer the phone.
23    Q.   Did you contact anybody else about trying to
24  get your job back?

                                                                  64
1        A.   Yes. Lea Davies and she referred me to Grace
2   Dobson, the secretary of the claims and appeals.
3        Q.   That was the letter you referred to?
4        A.   Yes. I know I sent her a letter saying I
5   wanted my job back.
6        Q.   Anybody else you contacted about getting your
7   job back?
8        A.   Not that I can remember.
9        Q.   Do you know whether there were any openings
10  where you were formerly working?
11       A.   From reading the newspaper, yes.
12       Q.   What in the newspaper did you read?
13       A.   They had had a legal issue with AT&T former
14  employees that they had let -- laid off or retired and
15  as far as I understood under the judgment they had to
16  hire that number of bodies back because it was deemed
17  not correct by the court.
18       Q.   When was this? When did you learn this?
19       A.   This was approximately the same time that I
20  was applying for a job.
21       Q.   You said AT&T?
22       A.   Something to do with AT&T, yes. Something to
23  do with AT&T employees that were employed or
24  incorporated by them. They had let them go and offered

Robert Parsons

65

1  early retirement to X number of people and the court
2  judged they had to reinstate X number of people. Being
3  as they offered retirement, I'm sure people were not
4  coming back to retirement I would assume.
5       Q.   Where did you read about this?
6       A.   In The Herald paper, Boston paper.
7       Q.   Did you read about that approximately July
8  2003 referring to an arbitrator's awarded rendered by a
9  Washington, D.C. arbitrator with respect to New York
10 Telephone; does that ring a bell?
11      A.   It could have been.
12      Q.   It may have been as late as July of 2003?
13      A.   Yes. It also could have been earlier.
14      Q.   Does the name D-A-S ring a bell?
15      A.   D-A-S in referring to what?
16      Q.   The arbitrator's name.
17      A.   No.
18      Q.   Did you save a copy of the thing you read?
19      A.   No.
20      Q.   Other than the thing you read about in The
21 Herald, is there anything else that leads you to
22 believe there was a job available to you?
23      A.   At the time they were employing temporary
24 employees to the best of my knowledge.

JONES REPORTING COMPANY
617-451-8900

66

1    Q.   In what job categories was the phone company
2  employing temporary employees?
3    A.   Into the craft positions.
4    Q.   Mr. Parsons, do you really know that or are
5  you kind of making it up?
6         MR. TEWHEY:  Objection to form.  You can
7  answer.
8    A.   That was hearsay from an employee.  Several
9  employees.
10   Q.   Hearsay when?
11   A.   Approximately the time I applied for my job.
12 January 2001, in that time frame so in that scope of
13 the year.  I can't define it any more than that.
14   Q.   Did you read in the newspaper that the
15 company declared a major surplus of employees at the
16 end of 2000?
17        MR. TEWHEY:  Objection.  Only if you know.
18        MR. TELEGEN:  Read it in the newspaper.
19 Either he did or he didn't.
20   A.   No.  I am not privy to that knowledge, no.
21   Q.   Who are the employees that told you there
22 were people employed as temporary employees?
23   A.   I don't know their names.  Just people I met
24 on the street type deal.  Driving a Verizon truck type

Robert Parsons

67

1  deal. Hi, how are you? How's it going? Still with
2  the company. I assume they were employees. They were
3  driving a Verizon truck.
4      Q.   Who was your last supervisor at the phone
5  company?
6      A.   Thomas Dolan.
7      Q.   And do you know if he is still employed by
8  Verizon?
9      A.   I don't have any idea.
10     Q.   When was the last time you spoke to
11 Mr. Dolan?
12     A.   Sometime in '98.
13     Q.   You didn't call Mr. Dolan up to see if your
14 job was still available in 2001?
15     A.   No.
16     Q.   Who did Mr. Dolan report to?
17     A.   Who did he report to?
18     Q.   Yes.
19     A.   He would report to his what is referred to in
20 the phone company as second level supervisor.
21     Q.   Who was the second level?
22     A.   I don't -- let me see. Actually when I left
23 the phone company, it was a vacant space if I remember
24 correctly.

Robert Parsons

68

1    Q.   In 2000 or 2001 did you talk to anybody
2  working at the Malden CO?
3    A.   No.
4    Q.   So you don't know what the employment
5  conditions were there?
6    A.   No.
7    Q.   Nor do you know first-hand whether the
8  company as hiring CO technicians?
9    A.   No.
10   Q.   Your complaint alleges one of the reasons you
11 weren't rehired was your age. What facts are you aware
12 of that would suggest someone decided not to hire you
13 because of your age?
14   A.   If I was reinstated by the phone company, I
15 think it would be expensive for them on a retirement
16 type deal. I think that the younger employee earns
17 less money. You had mentioned a merger with GTE. I
18 believe was it GTE and that company as far as the
19 scuttlebutt in the company was they don't really have a
20 retirement. They have a payout which is much less
21 expensive for the company I believe. It would behoove
22 the company to hire young employee because of less
23 benefits, less pay in the longer term employment.
24   Q.   Are you aware of any other facts that would

69

1  lead you to believe you weren't hired because of your
2  age?
3      A.   The only fact is that they were offering all
4  the older people early retirement adding on to their
5  time years and money.
6      Q.   Any other facts that would lead you to
7  believe that you weren't hired because of your age?
8      A.   No.
9      Q.   Are you aware of any facts that would lead
10 you to believe that you weren't hired because of a
11 disability or perceived disability or a record of
12 disability?
13     A.   Just the fact that through my employment I
14 have never seen them make accommodations for anyone.
15     Q.   Any other facts?
16     A.   No.  I guess not.
17     Q.   Who are the employees for whom the company
18 didn't make accommodations?
19     A.   Richard Hertz.
20     Q.   What was Mr. Hertz's problem?
21     A.   Broke his back and wound up in a wheelchair.
22     Q.   What was his job title?
23     A.   Toll tester technician.
24     Q.   Did he retire with a disability?

70

1   A.   He was forced to take a lesser job as a
2   secretary type deal. Secretary, line assigner,
3   something.
4   Q.   He was given a job that was consistent with
5   being in a wheelchair; is that right?
6   A.   I don't know. That was up to the company. I
7   just know where he went.
8   Q.   Any other examples of employees who were not
9   given accommodations?
10  A.   Not off the top of my head I guess.
11  Q.   Prior to Mr. Hertz's disability, did he do
12  the same job you did in terms of being a toll tester;
13  is that right?
14  A.   Prior to his disability?
15  Q.   Yes. He had to pull wires and disconnect
16  things and test things and things like that?
17  A.   Mm-mm, yes.
18       MR. TELEGEN: Mr. Tewhey, why don't we
19  suspend here if that's all right with you.
20       MR. TEWHEY: Okay.
21       MR. TELEGEN: We can resume Monday.
22       MR. TEWHEY: All right.
23       (Whereupon, at 12:51 p.m., the
24       deposition was suspended.)

72

1        CERTIFICATE

2   Commonwealth of Massachusetts

3   Suffolk ss.

4

5       I, Karen A. Morgan, Certified Shorthand Reporter

6   and Notary Public in and for the Commonwealth of

7   Massachusetts, do hereby certify that ROBERT PARSONS,

8   the witness whose deposition is hereinbefore set forth,

9   was duly sworn by me and that such deposition is a true

10  record of the testimony given by the witness.

11      I further certify that I am neither related to or

12  employed by any of the parties in or counsel to this

13  action, nor am I financially interested in the outcome

14  of this action.

15      In witness whereof, I have hereunto set my hand

16  and seal this 23rd day of November, 2004.

17

18                          _____

19                          Notary Public

20                          CSR/RPR

21

22  My commission expires:

23  November 28, 2008

24